**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| LISA FRANCOFORTE, et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GRACO CHILDREN'S PRODUCTS, INC.,<br><br>Defendant. | CIVIL ACTION NO. 2:20-cv-00137-LMM |

**<u>JOINT SUBMISSION REGARDING CLASS NOTICE AND NOTICE PLAN</u>**

Pursuant to the Court's Joint Pretrial Schedule (ECF No. 269), Plaintiffs and Defendant Graco Children's Products, Inc. ("Graco") jointly submit their respective positions regarding the proposed class notice and notice plan.

The Joint Pretrial Schedule directed the parties to meet and confer regarding class notice, including the language and methods of notice, and to submit their positions to the Court, including points of agreement and disagreement. The parties have met and conferred as directed and have agreed to substantially all of the language of the proposed Long-Form Notice and the methods of notice. Three issues remain for the Court's resolution: (1) the description of Plaintiffs' claims in the Long-Form Notice; (2) the Class period stated in the Long-Form Notice; and

(3) whether the Informational Release included in Plaintiffs' proposed Notice Plan should remain part of the Notice Plan.

Plaintiffs' proposed Long-Form Notice is attached as Exhibit A. Graco's proposed Long-Form Notice, reflecting Graco's proposed revisions to the remaining disputed language, is attached as Exhibit B. The highlighted language in Exhibits A and B show the parties' competing proposals for the few portions of the notice where they could not reach agreement. The Declaration of Cameron R. Azari, Esq. Regarding Notice Program, which sets forth Plaintiffs' proposed Notice Plan, is attached as Exhibit C.

## I. PROPOSED LONG-FORM NOTICE

The parties have agreed to substantially all of the language of the Long-Form Notice. The following two issues remain in dispute.

### A. Description of the Claims

The parties disagree concerning the language describing the nature of Plaintiffs' claims.

**Plaintiffs' Position**: Plaintiffs object to Defendant's proposed statement that there is no claim that the Booster Seats are "defective or unsafe for your child to use." Plaintiffs do not believe the Notice should characterize the safety of the products or effectively require Plaintiffs, through a Court-approved notice, to make an affirmative representation concerning their safety. Plaintiffs' proposed language

already makes clear that this action seeks economic damages and does not seek damages for personal injuries. Plaintiffs are not asking the Notice to state that the Booster Seats are defective or unsafe. But the fact that Plaintiffs do not assert a product-defect or personal-injury claim does not require the Notice to make the affirmative statement proposed by Graco concerning product safety. Plaintiffs believe the Notice should remain neutral on that issue.

Plaintiffs further object to removing the description of what Plaintiffs actually allege while retaining Defendant's characterization of what Plaintiffs do not allege. Plaintiffs believe that Class Members should be informed of what Plaintiffs actually allege—namely, the nature of the challenged "side-impact tested" representation—rather than simply being told that Plaintiffs allege violations of consumer-protection laws. Plaintiffs' proposed language also states Graco's position that it's labeling accurately described its products and that Graco denies Plaintiffs' allegations and any violation of consumer-protection or warranty laws. Plaintiffs believe this language fairly and neutrally informs Class Members of the nature of the claims and defenses.

**Plaintiffs' Proposed Language:**

This lawsuit relates to Defendant's advertising and pricing only. There is no claim for personal injuries. Plaintiffs allege that Graco advertised the booster seats as "side-impact tested" without adequately disclosing that its side-impact testing

evaluated occupant retention—whether the child remained in the seat—rather than whether the seats protected children from injury in side-impact collisions. Plaintiffs seek economic damages on behalf of the class. Defendant contends that the labeling on its belt-positioning boosters accurately described its products and denies that it violated any consumer protection or warranty laws.

**Graco's Position**: As Plaintiffs acknowledge, this action relates only to Graco's labeling of the booster seats at issue as "side-impact tested*". Plaintiffs do not allege the booster seats are defective or unsafe in any way nor will they offer any evidence suggesting such at trial. The class notice potentially will be seen by millions of people, many of whom are not members of the class and may spend little time examining a notice that does not apply to them. The lack of any specific statement regarding the lack of defect in the booster seats could lead many people to believe erroneously that Graco's products are defective or unsafe, with the attendant impacts that would have on Graco's business. It therefore is appropriate in this situation for the notice to include the accurate and undisputed statement that Plaintiffs do not claim the booster seats at issue are defective or unsafe in any way.

Graco also objects to Plaintiffs' proposed language because it implies that Graco did not conduct any side impact testing when, in fact, it is undisputed that the booster seats underwent side impact testing. To the extent Plaintiffs' proposed language is included in the class notice, it should be modified as follows to

accurately reflect Plaintiffs' allegations in this action: "… rather than whether the seats protected children from injury in **all types of** side-impact collisions." (Bold underlining added to identify new language only.)

**Graco's Proposed Language**:

This lawsuit relates to Defendant's advertising and pricing only. There is no claim for personal injuries or that Defendant's booster seats are defective or unsafe for your child to use. Defendant contends that the labeling on its belt-positioning boosters accurately described its products and denies that it violated any consumer protection or warranty laws.

**B. Class Period**

The parties disagree concerning the Class period that should be reflected in the Long-Form Notice.

**Plaintiffs' Position**: The Court's class-certification order defines the certified Classes to include:

"All persons within each State who purchased a new Graco belt-positioning booster seat class from 2015 through 2021, including the states of Alabama, Florida and New York."

Plaintiffs therefore propose that the Long-Form Notice use the 2015 through 2021 Class period contained in the Court's certification order. To the extent Defendant now objects to the Court-certified Class periods, Plaintiffs submit that

Defendant's post-certification objection is untimely and does not provide a basis to alter the certified Class definitions through the notice process. Plaintiffs do not concede Defendant's statute-of-limitations position or its proposed Class periods. Accordingly, Plaintiffs believe the Notice should reflect the Classes as presently certified by the Court.

**Graco's Position**: Graco proposes that the Long-Form Notice list 2017 through 2021 as the Class Period. There are three claims left in this case: breach of express warranty under Alabama law; violation of Florida's Deceptive and Unfair Trade Practices Act; and violation of New York's General Business Law. The Alabama and Florida claims are subject to a four-year statute of limitations while the New York claim is subject to a three-year statute. Plaintiffs first asserted the Alabama and Florida claims via the complaint filed on December 11, 2021, meaning purchases before December 11, 2017, by members of those state sub-classes fall outside of the statute of limitations. Plaintiffs first asserted the New York claim via the complaint filed on June 22, 2021, meaning purchases before June 22, 2018, by members of that state sub-class fall outside of the statute of limitations. The class period for each sub-class should commence at the statute of limitations line, *i.e.*, between December 11, 2017, and December 31, 2021, for the Alabama and Florida sub-classes and between June 22, 2018, and December 31, 2021, for the New York

sub-class. Plaintiffs do not dispute the applicable statute of limitations periods for their claims. Graco submits that the correct class periods for each claim (based on the applicable statute of limitations period) should be included in the notice, so that people who are barred on statute of limitations grounds do not mistakenly believe they may be entitled to compensation. Graco will submit a separate motion requesting that the Court modify the class definition so that it does not include members whose claims are barred by the applicable statute of limitations. **II. PROPOSED NOTICE PLAN**

Plaintiffs' proposed Notice Plan is set forth in the Declaration of Cameron R. Azari, Esq. Regarding Notice Program, attached as Exhibit C. The parties have agreed to the proposed methods of notice with the exception of the Informational Release described in paragraphs 42–43 of the Azari Declaration.

**A. Informational Release**

The proposed Notice Plan includes a party-neutral Informational Release in English and Spanish through PR Newswire. The Azari Declaration explains that the Informational Release is intended to provide additional notice exposure beyond that provided by the paid media campaign.

**Plaintiffs' Position**: Plaintiffs believe the Informational Release should remain part of the Notice Plan because Epiq included it as an additional means of expanding the reach of notice to potential Class Members beyond the paid media

campaign. As explained in the Azari Declaration, the party-neutral Informational Release would be distributed in English and Spanish through PR Newswire to general media outlets, websites, and parenting-related media contacts. Epiq explains that an Informational Release can play a "valuable role" in generating additional notice exposures beyond those provided by paid media. Plaintiffs therefore request that the Court approve the Informational Release as part of Epiq's proposed Notice Plan.

**Defendant's Position**: Defendant objects to inclusion of the Informational Release and requests that paragraphs 42–43 be removed from the Notice Plan.

Rule 23(c)(2)(B) requires class notice to be "the best notice that is practicable under the circumstances." The proposed notice plan already calls for class notice to be delivered via mail and/or email directly to those purchasers that can be identified from records; targeted digital advertising on a variety of internet sites and social media platforms to audiences likely to contain class members; and sponsored search listings on Google and other internet search engines. The plan also calls for the establishment of a case website and a toll-free telephone number for case inquiries. These methods will deliver class notice to all identified members of the class and will generate tens of millions (at least) of targeted impressions in audiences most likely to contain potential class members.

Plaintiffs' proposed informational release provides only speculative,

unmeasurable reach beyond the other notice vectors set forth in the plan. As Mr. Azari attests in ¶ 43 of his declaration, "there is no guarantee that any news stories will result" from the informational release, underscoring that this method is unlikely to reach class members who were notified via one or more of the other methods proposed in the class notice plan. On the other side of the scale, preparation and placement of the informational release will incur fees and costs that are disproportionate to the minimal utility this method provides in terms of class notice. And, if any news stories are generated through the release, they may generate frivolous claims, taint the jury pool, and/or lead to inflammatory publicity or new reports by third parties that are not bound to maintain the neutrality required of legal notice.

Accordingly, Graco's position is the class notice plan in this case should not include an informational release and ¶¶ 42-43 should be removed from Mr. Azari's declaration.

## III. REQUEST FOR APPROVAL

The parties respectfully request that the Court resolve the remaining disputed issues concerning the Long-Form Notice and Notice Plan and approve the form and methods of class notice so that notice may proceed in accordance with the schedule established by the Court.

Respectfully submitted this 6th day of October, 2026.

**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**

/s/ *Melissa R. Emert*
Melissa R. Emert (*pro hac vice*)
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Telephone: (845) 356-2570
Facsimile: (845) 356-4335
memert@kgglaw.com

**BRYSON HARRIS SUCIU & DEMAY PLLC**

Martha A. Geer (*pro hac vice*)
900 W. Morgan Street
Raleigh, North Carolina 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
mgeer@brysonpllc.com

**EVANGELISTA WORLEY, LLC**

James M. Evangelista
10 Glenlake Parkway
South Tower Suite 130
Atlanta, Georgia 30328
Telephone: (404) 205-8400
Facsimile: (404) 205-8395
Jim@ewlawllc.com

*Counsel for Plaintiffs*

**ARENTFOX SCHIFF LLP**

/s/ *Mir Y. Ali*
Joseph J. Krasovec, III (pro hac vice)
Mir Y. Ali (pro hac vice)
Jeffrey D. Skinner (pro hac vice)
J. Maxwell Heckendorn (pro hac vice)

233 S. Wacker Drive, Suite 7100
Chicago, Illinois 60606
Telephone: (312) 258-5500
joseph.krasovec@afslaw.com
mir.ali@afslaw.com
jeffrey.skinner@afslaw.com
max.heckendorn@afslaw.com

**WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC**
Nicholas P. Panayotopoulos
Georgia Bar No. 560679
Jennifer A. Adler
Georgia Bar No. 585635
3344 Peachtree Road, NE, Suite 2400
Atlanta, Georgia 30326
Tel: (404) 876-2700
Fax: (404) 875-9433
npanayo@wwhgd.com
jadler@wwhgd.com

*Counsel for Defendant Graco Children's Products, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which automatically sends e-mail notification of filing to any attorneys of record.

Dated: October 6, 2026.

**EVANGELISTA WORLEY, LLC**

*/s/ James M. Evangelista*
James M. Evangelista
Georgia Bar No. 707807
10 Glenlake Parkway
South Tower, Suite 130
Atlanta, Georgia 30328
Telephone: 404-205-8400
Jim@ewlawllc.com

# Exhibit A

# If you lived in Alabama, Florida, or New York when you purchased a new **Graco Affix or TurboBooster highback belt-positioning booster seat in those states** between 2015 through 2021, a class action lawsuit may affect your rights.

**Court-Approved Notice.** You may be a class member in a class action lawsuit involving Graco Children's Products, Inc. ("Defendant"). In this lawsuit, Plaintiffs allege that Defendant violated state consumer protection laws in New York and Florida and a warranty law in Alabama by advertising that its Affix and TurboBooster highback belt-positioning booster seats were "side-impact tested*."

This lawsuit relates to Defendant's advertising and pricing only. There is no claim for personal injuries. Plaintiffs allege that Graco advertised the booster seats as "side-impact tested" without adequately disclosing that its side-impact testing evaluated occupant retention-whether the child remained in the seat-rather than whether the seats protected children from injury in side-impact collisions. Plaintiffs seek economic damages on behalf of the class. Defendant contends that the labeling on its belt-positioning boosters accurately described its products and denies that it violated any consumer protection or warranty laws.

No judge or jury has concluded that Defendant did anything wrong, there is no money available now, and there is no guarantee that class members will recover a portion of the price they paid for their Affix or Turbo highback belt-positioning booster seat. Any potential recovery of money will depend on the outcome of trial or any settlement that is reached. If plaintiffs are successful you will be notified of how to submit a claim and receive money. However, if you are a class member, your legal rights are affected whether you act or not.

**If you did not purchase a new Graco Affix or TurboBooster highback belt-positioning booster seat between 2015 and 2021 while living in Alabama, Florida, or New York, this notice can be disregarded.**

**You are a class member if the following definition applies to you**:

**All persons who resided within Alabama, Florida or New York and purchased a new Graco Affix or TurboBooster highback belt-positioning booster seat from 2015 through 2021.**

**If you purchased a Graco Affix or TurboBooster highback belt-positioning booster seat in any other state or your purchase was outside the noted time periods, you are not a class member and are not affected by this Notice of this lawsuit.**

**Visit the case website at www.XXXXXXX.com for a list of the Graco belt-positioning highback booster seats.**

Plaintiffs must prove their legal claims against Defendant at a trial.

If you are a member of the class, your rights are affected whether you do nothing or opt out of the class:

| | |
|---|---|
| **Opt-Out:** You may submit an opt-out request if you do not want to be part of the class. The Court will exclude class members from the lawsuit who request to opt-out. If you ask to be excluded, and money or benefits are available later, you will not get any money or benefits. You will keep your right to sue separately. | Postmark by: **Month DD, 20YY** |
| **Do Nothing:** If you do nothing, you may become entitled to a portion of the price you paid for your Affix or TurboBooster highback belt-positioning booster seat if Plaintiffs prevail from a trial or as part of a settlement. But you will not be able to sue Defendant separately over the legal claims in this lawsuit and will be bound by any judgment. | |

**LEARN MORE**

***Scan this QR code, call toll-free 1-XXX-XXX-XXXX or visit www.XXXXXXXXXXXXXXX.com***

# NOTICE OF CLASS ACTION LAWSUIT

## 1. Why is this notice being provided?

This notice explains that the Court "certified" three state classes in a class action lawsuit called *Francoforte et al. v. Graco Children's Products, Inc.*, Case No. 2:20-cv-00137, in the United States District Court for the Northern District of Georgia, being handled by Judge Leigh Martin May. This means the Court has decided the lawsuit on behalf of purchasers of the Defendant's Affix and Turbo highback belt-positioning booster seats described herein who were residents of Alabama, Florida, and New York at the time of purchase can move forward as a class action.

The individuals who filed this lawsuit are called the "Plaintiffs" or "Class Representatives" and the company they filed a lawsuit against, Graco Children's Products, Inc., is called the "Defendant." Defendant denies it did anything wrong. The Court has not decided who is right or wrong.

## 2. What is the lawsuit about?

In this lawsuit, Plaintiffs allege that Defendant violated consumer protection laws in New York and Florida and a warranty law in Alabama by advertising that its belt-positioning highback booster seats were "side-impact tested*". Plaintiffs seek economic damages on behalf of the class. Defendant contends that the labeling on its belt-positioning boosters accurately described its products, denies Plaintiffs' allegations of any wrongdoing, and denies that it violated any consumer protection or warranty laws. Plaintiffs allege that Defendant did not disclose that its side-impact testing was not designed to measure injury or other child-safety outcomes in side-impact collisions, but instead tested occupant retention.

## 3. Why is this lawsuit a class action?

In a class action, one or more people (called class representatives) file a lawsuit for others who have the same or similar legal claims. Together, these people are called a "class" or "class members." One court resolves the issues for all class members, except for those class members who opt-out of the class by the deadline.

## 4. What are the Plaintiffs asking for?

The Plaintiffs are asking for money for the class members for Defendant's alleged wrongdoings. The Plaintiffs are also asking for attorneys' fees and costs for Class Counsel.

## 5. Is there any money available now?

No. The Court has not decided whether Defendant did anything wrong or whether any members of the class are entitled to relief. Therefore, there is no money available now and there is no guarantee that money or benefits will be available in the future. **If money or benefits are available later and you are a member of the class, notice will be provided to alert class members**. You may have to take additional steps, such as submitting a claim form, in order to receive any potential award (money).

# Class

## 6. How do I know if I am included in the class?

You are a member of the class if the following definition applies to you: All residents of Alabama, Florida and New York who purchased a new Graco Affix or TurboBooster highback belt-positioning booster seat from2015 through 2021.

## 7. What products are included in the lawsuit?

The lawsuit concerns **Graco highback belt-positioning booster seats purchased at certain times in Alabama, Florida, or New York between 2015 through 2021, including the TurboBooster Highback Booster and Affix Highback Booster Seat.** Visit the case website at www.XXXXXXX.com for additional information about the covered booster seats.

## 8. What if I am still not sure if I am member of the class?

If you are still not sure if you are a member of the class, you may go to www.XXXXXXXXXXX.com or call toll-free 1-XXX-XXX-XXXX for more information.

## 9. What am I giving up by staying in the class?

All Court orders and any judgments will apply to you and legally bind you. This means you will not be able to continue or be part of any other lawsuit against Defendant about the legal claims in this lawsuit.

## 10. What happens if I opt-out of the class?

# Opt-Out of the Class

You may opt-out of the class and the Court will exclude you from the lawsuit. If you do not want to be included in the class, you must opt-out.

If you opt-out:

- **You will not receive any money or benefits if they are available later; and**
- The Court's orders and any judgments will *not* apply to you.
- You will keep your legal right to be part of another lawsuit about the legal claims against Defendant in this lawsuit.

## 11. How do I opt-out of the class?

To opt-out of the class, you must mail a written request and include the following information:

1) Your name, address, telephone number, and email address;
2) Your personal signature; and
3) A statement that you want to opt-out of the class, such as, "I want to opt-out of the class in *Francoforte et al. v. Graco Children's Products, Inc.*, Case No. 2:20-CV-00137-LMM."

Your opt-out must be **postmarked** by **Month DD, 20YY**, and **mailed** to:

*Francoforte v. Graco*
Opt-Out
PO Box XXXX
Portland, OR 972XX-XXXX

**You cannot opt-out of the class by telephone or by email.**

"Mass" opt-outs are opt-outs submitted for multiple class members by a third-party. Mass opt-outs will not be allowed, unless each opt-out is signed by the member of the class.

# Do Nothing

## 12. If I do not opt-out of the class, can I file a lawsuit for the same thing later?

No. You will give up your right to be part of a lawsuit against the Defendant for the legal claims involved in this lawsuit. You will be bound by the Court's orders and judgments in the lawsuit.

### 13. What do I need to know about the postmark deadline?

Please note that per the United States Postal Service, mail may *not* be postmarked the day it is put in a mailbox or dropped off at a local post office. Postmarks occur when mail reaches a processing facility.

To meet a postmark deadline, it is recommended that you either **mail your opt out request at least a week prior to the postmark deadline**, get a manual postmark in-person at any post office, or send your opt out request via Certified Mail.

### 14. What happens if I do nothing?

If you do nothing, you will stay in the class, and all of the Court's orders and any judgments will apply to you. You will not be able to sue Defendant separately for the legal claims involved in this lawsuit.

If any money or benefits from this class action lawsuit are available later, you may become entitled to a portion of the price you paid for your highback belt-positioning booster seat.

### 15. As a member of the class, do I have a lawyer in the lawsuit?

Yes. The Court appointed **Melissa R. Emert of Kantrowitz, Goldhamer, Graifman, Perlmutter & Carballo, P.C. and Martha A. Geer of Bryson Harris Suciu Demay as Class Counsel.** You will not be charged for these lawyers' services. Additional information about Class Counsel and their contact information is available on the case website at www.XXXXXXX.com.

## Class Counsel

You may hire your own lawyer at your own cost if you want a lawyer other than Class Counsel to represent you in this lawsuit.

### 16. How will Class Counsel be paid?

If Class Counsel gets money or benefits for the class, they will ask the Court for attorneys' fees and expenses. You will not have to personally pay the attorneys' fees and expenses. If the Court grants Class Counsels' request, the attorneys' fees and expenses will either be deducted from the money obtained for the class or paid separately by Defendant.

## Trial

### 17. What is a trial?

Class Counsel will have to prove Plaintiffs' legal claims at a trial. During the trial, a judge and jury will hear evidence to help them decide whether Plaintiffs or Defendant are right about their claims in this lawsuit. There is no guarantee that Plaintiffs will win or that they will get money for the class.

### 18. When is the trial?

**When:** **Month DD, 20YY, at XX:XX [am/pm] [time zone]**

**Where:** [Courthouse, Address, City, ST Zip]

The date and time of the trial may change without further notice. You should check www.XXXXXXXXXXX.com to confirm the date and time of the hearing.

## 19. Do I have to attend the trial?

No. Class Counsel will present the case for Plaintiffs and the class. You may attend at your own expense, but you do not have to attend.

## 20. Will I get money after the trial?

If Plaintiffs get money as a result of the lawsuit, and you stay in the class, you will be told how you can receive your money. It is unknown how long this will take.

# Get More Information

## 21. How do I get more information?

Here are the ways to get more information.

**Scan:**

SAMPLE

**Visit:**
www.XXXXXXXXXXX.com

**Call:**
1-XXX-XXX-XXXX

**Write:**
*Francoforte v. Graco*
Notice Administrator
PO Box XXXX
Portland, OR 972XX-XXXX

**PLEASE DO NOT CALL THE COURT OR CLERK'S OFFICE ABOUT THIS NOTICE.**

# Exhibit B

# If you lived in Alabama, Florida, or New York when you purchased a new **Graco Affix or TurboBooster highback belt-positioning booster seat in those states** between 2017 through 2021, a class action lawsuit may affect your rights.

**Court-Approved Notice.** You may be a class member in a class action lawsuit involving Graco Children's Products, Inc. ("Defendant"). In this lawsuit, Plaintiffs allege that Defendant violated state consumer protection laws in New York and Florida and a warranty law in Alabama by advertising that its Affix and TurboBooster highback belt-positioning booster seats were "side-impact tested*."

This lawsuit relates to Defendant's advertising and pricing only. There is no claim for personal injuries or that Defendant's booster seats are defective or unsafe for your child to use. Defendant contends that the labeling on its belt-positioning boosters accurately described its products and denies that it violated any consumer protection or warranty laws.

No judge or jury has concluded that Defendant did anything wrong, there is no money available now, and there is no guarantee that class members will recover a portion of the price they paid for their Affix or Turbo highback belt-positioning booster seat. Any potential recovery of money will depend on the outcome of trial or any settlement that is reached. If plaintiffs are successful you will be notified of how to submit a claim and receive money. However, if you are a class member, your legal rights are affected whether you act or not.

**If you did not purchase a new Graco Affix or TurboBooster highback belt-positioning booster seat between 2017 and 2021 while living in Alabama, Florida, or New York, this notice can be disregarded.**

**You are a class member if the following definition applies to you**:

**All persons who resided within one of the following three States and purchased a new Graco Affix or TurboBooster highback belt-positioning booster seat during the periods listed below:**

**Alabama: December 11, 2017 through December 31, 2021**

**Florida: December 11, 2017 through December 31, 2021**

**New York: June 22, 2018 through December 31, 2021**

**If you purchased a Graco Affix or TurboBooster highback belt-positioning booster seat in any other state or your purchase was outside the noted time periods, you are not a class member and are not affected by this Notice of this lawsuit.**

**Visit the case website at www.XXXXXXX.com for a list of the Graco belt-positioning highback booster seats.**

Plaintiffs must prove their legal claims against Defendant at a trial.

If you are a member of the class, your rights are affected whether you do nothing or opt out of the class:

| | |
|---|---|
| **Opt-Out:** You may submit an opt-out request if you do not want to be part of the class. The Court will exclude class members from the lawsuit who request to opt-out. If you ask to be excluded, and money or benefits are available later, you will not get any money or benefits. You will keep your right to sue separately. | Postmark by: **Month DD, 20YY** |
| **Do Nothing:** If you do nothing, you may become entitled to a portion of the price you paid for your Affix or TurboBooster highback belt-positioning booster seat if Plaintiffs prevail from a trial or as part of a settlement. But you will not be able to sue Defendant separately over the legal claims in this lawsuit and will be bound by any judgment. | |

SAMPLE

## LEARN MORE

***Scan this QR code, call toll-free 1-XXX-XXX-XXXX***
***or visit www.XXXXXXXXXXXXXXX.com***

# NOTICE OF CLASS ACTION LAWSUIT

## 1. Why is this notice being provided?

This notice explains that the Court "certified" three state classes in a class action lawsuit called *Francoforte et al. v. Graco Children's Products, Inc.*, Case No. 2:20-cv-00137, in the United States District Court for the Northern District of Georgia, being handled by Judge Leigh Martin May. This means the Court has decided the lawsuit on behalf of purchasers of the Defendant's Affix and Turbo highback belt-positioning booster seats described herein who were residents of Alabama, Florida, and New York at the time of purchase can move forward as a class action.

The individuals who filed this lawsuit are called the "Plaintiffs" or "Class Representatives" and the company they filed a lawsuit against, Graco Children's Products, Inc., is called the "Defendant." Defendant denies it did anything wrong. The Court has not decided who is right or wrong.

## 2. What is the lawsuit about?

In this lawsuit, Plaintiffs allege that Defendant violated consumer protection laws in New York and Florida and a warranty law in Alabama by advertising that its belt-positioning highback booster seats were "side-impact tested*". There is no claim that Defendant's belt-positioning booster seats are defective or unsafe for your child to use. Plaintiffs allege Defendant violated state consumer protection laws in New York and Florida and a warranty law in Alabama by advertising that its Affix and TurboBooster highback belt-positioning booster seats were "side-impact tested*". Plaintiffs seek economic damages on behalf of the class. Defendant contends that the labeling on its belt-positioning boosters accurately described its products, denies Plaintiffs' allegations of any wrongdoing, and denies that it violated any consumer protection or warranty laws.

## 3. Why is this lawsuit a class action?

In a class action, one or more people (called class representatives) file a lawsuit for others who have the same or similar legal claims. Together, these people are called a "class" or "class members." One court resolves the issues for all class members, except for those class members who opt-out of the class by the deadline.

## 4. What are the Plaintiffs asking for?

The Plaintiffs are asking for money for the class members for Defendant's alleged wrongdoings. The Plaintiffs are also asking for attorneys' fees and costs for Class Counsel.

## 5. Is there any money available now?

No. The Court has not decided whether Defendant did anything wrong or whether any members of the class are entitled to relief. Therefore, there is no money available now and there is no guarantee that money or benefits will be available in the future. **If money or benefits are available later and you are a member of the class, notice will be provided to alert class members**. You may have to take additional steps, such as submitting a claim form, in order to receive any potential award (money).

# Class

## 6. How do I know if I am included in the class?

You are a member of the class if the following definition applies to you: All residents of Alabama, Florida and New York who purchased a new Graco Affix or TurboBooster highback belt-positioning booster

seat between December 11, 2017 and December 31, 2021 in Alabama or Florida or between June 22, 2018 and December 31, 2021 in New York.

## 7. What products are included in the lawsuit?

The lawsuit concerns **Graco highback belt-positioning booster seats purchased at certain times in Alabama, Florida, or New York between 2017 through 2021, including the TurboBooster Highback Booster and Affix Highback Booster Seat.** Visit the case website at www.XXXXXXX.com for additional information about the covered booster seats.

## 8. What if I am still not sure if I am member of the class?

If you are still not sure if you are a member of the class, you may go to www.XXXXXXXXXXX.com or call toll-free 1-XXX-XXX-XXXX for more information.

## 9. What am I giving up by staying in the class?

All Court orders and any judgments will apply to you and legally bind you. This means you will not be able to continue or be part of any other lawsuit against Defendant about the legal claims in this lawsuit.

# Opt-Out of the Class

## 10. What happens if I opt-out of the class?

You may opt-out of the class and the Court will exclude you from the lawsuit. If you do not want to be included in the class, you must opt-out.

If you opt-out:

- **You will not receive any money or benefits if they are available later; and**
- The Court's orders and any judgments will *not* apply to you.
- You will keep your legal right to be part of another lawsuit about the legal claims against Defendant in this lawsuit.

## 11. How do I opt-out of the class?

To opt-out of the class, you must mail a written request and include the following information:

1) Your name, address, telephone number, and email address;
2) Your personal signature; and
3) A statement that you want to opt-out of the class, such as, "I want to opt-out of the class in *Francoforte et al. v. Graco Children's Products, Inc.*, Case No. 2:20-CV-00137-LMM."

Your opt-out must be **postmarked** by **Month DD, 20YY**, and **mailed** to:

*Francoforte v. Graco*
Opt-Out
PO Box XXXX
Portland, OR 972XX-XXXX

**You cannot opt-out of the class by telephone or by email.**

"Mass" opt-outs are opt-outs submitted for multiple class members by a third-party. Mass opt-outs will not be allowed, unless each opt-out is signed by the member of the class.

## Do Nothing

### 12. If I do not opt-out of the class, can I file a lawsuit for the same thing later?

No. You will give up your right to be part of a lawsuit against the Defendant for the legal claims involved in this lawsuit. You will be bound by the Court's orders and judgments in the lawsuit.

### 13. What do I need to know about the postmark deadline?

Please note that per the United States Postal Service, mail may *not* be postmarked the day it is put in a mailbox or dropped off at a local post office. Postmarks occur when mail reaches a processing facility.

To meet a postmark deadline, it is recommended that you either **mail your opt out request at least a week prior to the postmark deadline**, get a manual postmark in-person at any post office, or send your opt out request via Certified Mail.

### 14. What happens if I do nothing?

If you do nothing, you will stay in the class, and all of the Court's orders and any judgments will apply to you. You will not be able to sue Defendant separately for the legal claims involved in this lawsuit.

If any money or benefits from this class action lawsuit are available later, you may become entitled to a

## Class Counsel

portion of the price you paid for your highback belt-positioning booster seat.

### 15. As a member of the class, do I have a lawyer in the lawsuit?

Yes. The Court appointed **Melissa R. Emert of Kantrowitz, Goldhamer, Graifman, Perlmutter & Carballo, P.C. and Martha A. Geer of Bryson Harris Suciu Demay as Class Counsel.** You will not be charged for these lawyers' services. Additional information about Class Counsel and their contact information is available on the case website at www.XXXXXXX.com.

You may hire your own lawyer at your own cost if you want a lawyer other than Class Counsel to represent you in this lawsuit.

### 16. How will Class Counsel be paid?

If Class Counsel gets money or benefits for the class, they will ask the Court for attorneys' fees and expenses. You will not have to personally pay the attorneys' fees and expenses. If the Court grants Class Counsels' request, the attorneys' fees and expenses will either be deducted from the money obtained for the class or paid separately by Defendant.

## Trial

### 17. What is a trial?

Class Counsel will have to prove Plaintiffs' legal claims at a trial. During the trial, a judge and jury will hear evidence to help them decide whether Plaintiffs or Defendant are right about their claims in this lawsuit. There is no guarantee that Plaintiffs will win or that they will get money for the class.

## 18. When is the trial?

**When:** **Month DD, 20YY, at XX:XX [am/pm] [time zone]**

**Where:** [Courthouse, Address, City, ST Zip]

The date and time of the trial may change without further notice. You should check www.XXXXXXXXXXX.com to confirm the date and time of the hearing.

## 19. Do I have to attend the trial?

No. Class Counsel will present the case for Plaintiffs and the class. You may attend at your own expense, but you do not have to attend.

## 20. Will I get money after the trial?

If Plaintiffs get money as a result of the lawsuit, and you stay in the class, you will be told how you can receive your money. It is unknown how long this will take.

# Get More Information

## 21. How do I get more information?

Here are the ways to get more information.

**Scan:**

SAMPLE

**Visit:**

**Call:**
1-XXX-XXX-XXXX

**Write:**
*Francoforte v. Graco*
Notice Administrator
PO Box XXXX
Portland, OR 972XX-XXXX

**PLEASE DO NOT CALL THE COURT OR CLERK'S OFFICE ABOUT THIS NOTICE.**

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| LISA FRANCOFORTE, *individually and on behalf of all others similarly situated, et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GRACO CHILDREN'S PRODUCTS, INC.,<br><br>Defendant. | CIVIL ACTION NO. 2:20-cv-00137-LMM |

**DECLARATION OF CAMERON R. AZARI, ESQ. REGARDING NOTICE PROGRAM**

I, Cameron R. Azari, Esq., hereby declare and state as follows:

1. My name is Cameron R. Azari, Esq. I have personal knowledge of the matters set forth herein, and I believe them to be true and correct.

2. I am a nationally recognized expert in the field of legal notice and have served as an expert in hundreds of federal and state cases involving class action notice plans.

3. I am a Senior Vice President of Epiq Class Action & Claims Solutions, Inc. ("Epiq") and the Managing Director of Epiq Legal Noticing (aka Hilsoft Notifications), a business unit of Epiq that specializes in designing, developing, analyzing, and implementing large-scale, un-biased, legal notification plans.

4. Epiq is an industry leader in class action administration, having implemented more than a thousand successful class action notice and settlement administration matters. Epiq Legal Noticing has handled some of the most complex and significant notice programs in recent history, examples of which are discussed below. With experience in more than 700 cases, including more than 75 multidistrict litigation settlements, Epiq Legal Noticing has prepared notices that have appeared in 53 languages and been distributed in almost every country, territory, and dependency in the world. Courts have recognized

and approved numerous notice plans developed by Epiq Legal Noticing, and those decisions have invariably withstood appellate review.

**RELEVANT EXPERIENCE**

5. I have served as a notice expert and have been recognized and appointed by courts to design and provide notice in many significant cases, including:

a) *Rodriguez, et al. v. Google LLC* 20-cv-04688 (N.D. Cal.), is a landmark privacy lawsuit for which Epiq implemented an extensive notice program with one of the largest, if not the largest email campaign ever for a class action lawsuit, sending more than 369 million email notices. The email notices were successfully delivered to approximately 93.1% of the class who were sent an email notice. The reach of the individual notice effort was enhanced by a media plan that included digital and social media notice that generated over 178 million impressions, sponsored search listings, and a case website. Overall, the Class Notice Plan reached well in excess of 85% of the Class.

b) *In re Juul Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation* 19-md-02913 (N.D. Cal.), involved two settlements totaling $300 million for JUUL Labs, Inc. and Altria, which alleged consumers were misled about JUUL products' addictiveness and safety, causing them to pay more, and that JUUL products were unlawfully marketed to minors. Two companion notice programs were implemented with more than 10.7 million email notices and nearly 500,000 postcard notices sent to potential class members and comprehensive media efforts (over 936 million impressions delivered). The notice programs each reached approximately 80% of the class nationwide.

c) *In Re: Zoom Video Communications, Inc. Privacy Litigation*, 3:20-cv-02155 (N.D. Cal.), involved an extensive notice plan for a $85 million privacy settlement involving Zoom, the most popular videoconferencing platform. Notice was sent to more than 158 million class members by email or mail, and millions of reminder notices were sent to stimulate claim filings. The individual notice efforts reached approximately 91% of the class. A supplemental media campaign provided notice via regional newspaper notice, nationally distributed digital and social media notice (delivering more than 280 million impressions), sponsored search, an informational release, and a settlement website.

d) *In re Takata Airbag Products Liability Litigation*, MDL No. 2599, 1:15-md-02599 (S.D. Fla.), involved $1.91 billion in settlements with BMW, Mazda, Subaru, Toyota, Honda, Nissan,

Ford, and Volkswagen regarding Takata airbags. The notice programs included individual mailed notice to more than 61.8 million potential class members and extensive nationwide media via consumer publications, U.S. Territory newspapers, radio, digital notices, mobile digital notices, and behaviorally targeted digital media. Combined, the notice programs reached more than 95% of adults aged 18+ in the U.S. who owned or leased a subject vehicle, with a frequency of 4.0 times each.

e) *In Re: Capital One Consumer Data Security Breach Litigation*, MDL No. 2915, 1:19-md-02915 (E.D. Va.), involved an extensive notice program for a $190 million data breach settlement. Notice was sent to more than 93.6 million settlement class members by email or mail. The individual notice efforts reached approximately 96% of the identified settlement class members and were enhanced by a supplemental media plan that included digital and social media notices (delivering more than 123.4 million impressions), sponsored search, and a settlement website.

f) *In re: Disposable Contact Lens Antitrust Litigation*, 3:15-md-02626 (M.D. Fla.), involved several notice programs to notify retail purchasers of disposable contact lenses for four separate settlements totaling $88 million. For each notice program more than 1.98 million email or postcard notices were sent to potential class members and a comprehensive media plan was implemented, with a well-read nationwide consumer publication, internet digital notices (delivering more than 312.9 million – 461.4 million impressions per campaign), sponsored search listings, and a case website.

g) *In re U.S. Office of Personnel Management Data Security Breach Litigation* MDL No. 2664, 15-cv-01394 (D.D.C.), involved a $63 million settlement for compromised personal information of then-current and former federal government employees and contractors, and certain applicants for federal employment. An extensive nationwide media notice campaign was implemented using magazines, digital and social media notices (delivering more than 758 million impressions), traditional and satellite radio, and other forms of media. The media notice reached at least 85% of the class. In addition, more than 3.5 million email notices and/or postcard notices were sent to identified class members. The notice program was supplemented with outreach to unions and associations, sponsored search listings, an informational release, and a settlement website.

h) *In re: fairlife Milk Products Marketing and Sales Practices Litigation*, 1:19-cv-03924 (N.D. Ill.), involved a $21 million settlement against The Coca-Cola Company, fairlife, LLC, and

other defendants alleging false labeling and marketing of fairlife milk products. A comprehensive media plan was implemented with a consumer print publication notice, targeted digital and social media notices (delivering more than 620.1 million impressions in English and Spanish nationwide). Combined with individual notice to a small percentage of the class, the notice plan reached approximately 80.2% of the class. The reach was further enhanced by sponsored search, an informational release, and a website.

i) *In re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL No. 1720 (E.D.N.Y.). Second Circuit affirmed. *See Fikes Wholesale, Inc. v. Visa U.S.A., Inc.* 62 F.4th 704 (2d Cir. 2023). The case involved a $5.5 billion settlement reached by Visa and MasterCard. An intensive initial notice program included more than 19.8 million direct mail notices sent to potential class members, together with insertions in over 1,500 newspapers, consumer magazines, national business publications, trade and specialty publications, with notices in multiple languages, and a digital notice campaign (delivering more than 770 million adult impressions). Sponsored search listings and a settlement website in eight languages expanded the notice program. For the subsequent settlement reached by Visa and MasterCard, an extensive notice program was implemented, which included over 16.3 million direct mail notices to class members together with more than 354 print publication insertions and digital notices (delivering more than 689 million adult impressions).

j) *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179 (E.D. La.), involved landmark settlement notice programs to distinct "Economic and Property Damages" and "Medical Benefits" settlement classes for BP's $7.8 billion settlement of claims related to the Deepwater Horizon oil spill. Notice efforts included more than 7,900 television spots, 5,200 radio spots, and 5,400 print insertions and reached over 95% of Gulf Coast residents.

6. Courts have recognized our testimony as to which method of notification is appropriate for a given case, and I have provided testimony on numerous occasions on whether a certain method of notice represents the best notice practicable under the circumstances. Numerous court opinions and comments regarding my testimony, and the adequacy of our notice efforts, are included in the Epiq Legal Noticing *curriculum vitae* included as **Attachment 1**.

7. In forming expert opinions, my staff and I draw from our in-depth class action case experience, as well as our educational and related work experiences. I am an active member of the

Oregon State Bar, having received my Bachelor of Science from Willamette University and my Juris Doctor from Northwestern School of Law at Lewis and Clark College. I have served as the Director of Legal Notice for Epiq since 2008 and have overseen the detailed planning of virtually all of our court-approved notice programs during that time. Overall, I have more than 26 years of experience in the design and implementation of legal notification and claims administration programs, having been personally involved in well over one hundred successful notice programs.

8. The facts in this declaration are based on my personal knowledge, as well as information provided to me by my colleagues in the ordinary course of business at Epiq and Epiq Legal Noticing (hereinafter "Epiq").

## OVERVIEW

9. This declaration describes the Class Certification Notice Program ("Notice Program") and notice (the "Notice" or "Notices") proposed here for *Francoforte et al. v. Graco Children's Products, Inc.*, Case No. 2:20-CV-00137, in the United States District Court for the Northern District of Georgia. Epiq designed this Notice Program based on our extensive prior experience and research into the notice issues particular to this case. We designed a Notice Program that is the best notice practicable under the circumstances to provide notice to the class.

## DATA PRIVACY AND SECURITY

10. Epiq has procedures in place to protect the security of class data. As with all cases, Epiq will maintain extensive data security and privacy safeguards in its official capacity as the Administrator for this action. A Services Agreement, which formally retains Epiq as the Administrator, will govern Epiq's administration responsibilities for the action. Service changes or modification beyond the original contract scope will require formal contract addendum or modification. Epiq maintains adequate insurance in case of errors.

11. With respect to the data it receives, collects, and otherwise hosts, Epiq serves as a data processor and acts only at the direction of the designated data controller or of the Court, as described in applicable contracts, statements of work, and/or Court documents and Orders. Epiq does not utilize or perform other procedures on personal data provided or obtained as part of services as Administrator. Epiq will not use any information provided by class members for any other purpose than the

administration of this action. Specifically, class member information will not be used, disseminated, or disclosed by or to any other person for any other purpose unrelated to the administration of this action.

12. The security and privacy of clients' and class members' information and data are paramount to Epiq. That is why Epiq has invested in a layered and robust set of trusted security personnel, controls, and technology to protect the data we handle. To promote a secure environment for client and class member data, industry leading firewalls and intrusion prevention systems protect and monitor Epiq's network perimeter with regular vulnerability scans and penetration tests. Epiq deploys best-in-class endpoint detection, response, and anti-virus solutions on our endpoints and servers. Strong authentication mechanisms and multi-factor authentication are required for access to Epiq's systems and the data we protect. In addition, Epiq has employed the use of behavior and signature-based analytics as well as monitoring tools across our entire network, which are managed 24 hours per day, 7 days per week, by a team of experienced professionals.

13. Epiq's world class data centers are defended by multi-layered, physical access security, including formal ID and prior approval before access is granted, closed-circuit television ("CCTV"), alarms, biometric devices, and security guards, 24 hours per day, 7 days per week. Epiq manages minimum Tier 3+ data centers in 18 locations worldwide. Our centers have robust environmental controls including uninterruptable power supply ("UPS"), fire detection and suppression controls, flood protection, and cooling systems.

14. Beyond Epiq's technology, our people play a vital role in protecting class members' and our clients' information. Epiq has a dedicated information security team comprised of highly trained, experienced, and qualified security professionals. Our teams stay on top of important security issues and retain important industry standard certifications, like SysAdmin, Audit, Network, and Security ("SANS"), Certified Information Systems Security Professional ("CISSP"), and Certified Information Systems Auditor ("CISA"). Epiq is continually improving security infrastructure and processes based on an ever-changing digital landscape. Epiq also partners with best-in-class security service providers. Our robust policies and processes cover all aspects of information security to form part of an industry leading security and compliance program, which is regularly assessed by independent third parties.

15. Epiq holds several industry certifications including: Trusted Information Security Assessment Exchange ("TISAX"), Cyber Essentials, Privacy Shield, and ISO 27001. In addition to retaining these certifications, we are aligned to Health Insurance Portability and Accountability Act ("HIPAA"), National Institute of Standards and Technology ("NIST"), and Federal Information Security Management Act ("FISMA") frameworks. Epiq follows local, national, and international privacy regulations. To support our business and staff, Epiq has a dedicated team to facilitate and monitor compliance with privacy policies. Epiq is also committed to a culture of security mindfulness. All employees routinely undergo cybersecurity trainings to ensure that safeguarding information and cybersecurity vigilance is a core practice in all aspects of the work our teams complete.

16. Upon completion of a project, Epiq continues to host all data until otherwise instructed in writing by the Court and/or the Parties to delete, archive or return such data. When Court and/or the Parties request that Epiq delete or destroy all data, Epiq agrees to delete or destroy all such data; provided, however, that Epiq may retain data as required by applicable law, rule or regulation, and to the extent such copies are electronically stored in accordance with Epiq's record retention or back-up policies or procedures (including those regarding electronic communications) then in effect. Epiq keeps data in line with the Parties and/or the Court's retention requirements. If no retention period is specified, Epiq returns the data to as directed by the Court or securely deletes it as appropriate.

## NOTICE PROGRAM METHODOLOGY

17. Federal Rules of Civil Procedure, Rule 23 directs that notice must be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort" and that "the notice may be by one or more of the following: United States mail, electronic means, or other appropriate means."[1] The Notice Program as designed satisfies these requirements.

18. This Notice Program is designed to reach the greatest practicable number of class members through a combination of individual notice (it is my understanding from counsel that contact information may be available for some potential class members), together with the Media Plan described below.

---

[1] Fed. R. Civ. P. 23(c)(2)(B).

Given our experience with similar notice efforts, we expect the Media Plan will reach at least 70% of the class, with an average frequency of 2.0 times. "Reach" refers to the estimated percentage of the unduplicated audience exposed to the notice. Notice exposure is defined as the opportunity to see a notice. "Frequency" of notice exposure is the average number of times that those reached by a notice will be exposed to the notice. The reach will be further enhanced by internet sponsored search listings, an informational release, and a case website, which are not included in the estimated reach calculation. In my experience, the Notice Program is consistent with other court-approved notice plans, is the best notice practicable under the circumstances of this case and has been designed to satisfy the requirements of due process, including its "desire to actually inform" requirement.[2]

19. Data sources and tools commonly employed by experts in the advertising industry were used to analyze and develop the media component of the Notice Program. These resources include MRI-Simmons,[3] which provides statistically significant readership and product usage data, Comscore,[4] which provides similar usage data specific to online media, and Alliance for Audited Media ("AAM")[5] statements, which certify

---

[2] *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 315 (1950) ("But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected . . .").

[3] MRI-Simmons is a leading source of publication readership and product usage data for the communications industry. MRI-Simmons is a joint venture of GfK Mediamark Research & Intelligence, LLC ("MRI") and Simmons Market Research. MRI-Simmons offers comprehensive demographic, lifestyle, product usage and exposure to all forms of advertising media collected from a single sample. As the leading U.S. supplier of multimedia audience research, the company provides information to magazines, televisions, radio, internet, and other media, leading national advertisers, and over 450 advertising agencies—including 90 of the top 100 in the United States. MRI-Simmons's national syndicated data is widely used by companies as the basis for the majority of the media and marketing plans that are written for advertised brands in the United States.

[4] Comscore is a global internet information provider for planning, transacting, and evaluating media across platforms. With a data footprint that combines digital, linear TV, OTT and theatrical viewership intelligence with advanced audience insights, Comscore allows media buyers and sellers to quantify their multiscreen behavior. A leader in measuring digital and TV audiences and advertising at scale, Comscore is the industry's emerging, third-party source for reliable and comprehensive cross-platform measurement.

[5] Established in 1914 as the Audit Bureau of Circulations ("ABC") and rebranded as Alliance for Audited Media ("AAM") in 2012, AAM is a non-profit cooperative formed by media, advertisers, and advertising agencies to audit the paid circulation statements of magazines and newspapers. AAM is the leading third-party auditing organization in the United States. It is the industry's leading, neutral source for

how many readers buy or obtain copies of publications. These tools, as applicable, along with demographic breakdowns indicating how many people use each media vehicle, as well as computer software that take the underlying data and factor out the duplication among audiences of various media vehicles, allow the net (unduplicated) reach of a particular media schedule to be determined. The combined results of this analysis are used to help determine the sufficiency and effectiveness of a notice plan.

20. ***Tools and data trusted by the communications industry and courts.*** Virtually all the nation's largest advertising agency media departments utilize, scrutinize, and rely upon such independent, time-tested data and tools, including net reach and de-duplication analysis methodologies, to guide the billions of dollars of advertising placements seen today, providing assurance that these figures are not overstated. These analyses and similar planning tools have become standard analytical tools for evaluating legal notice programs and have been regularly accepted by courts.

21. In fact, advertising and media planning firms around the world have long relied on audience data and techniques: AAM data has been relied on since 1914;[6] 90 to 100% of media directors use reach and frequency planning;[7] all the leading advertising and communications textbooks cite the need to use reach and frequency planning.[8] MRI-Simmons data is accredited by the Media Rating Council (MRC), a United States–based nonprofit organization that manages accreditation for media research and rating purposes. Comscore is used by the largest television networks, digital media properties, brands, agencies, and film studios in the world for digital media buying and planning.

---

documentation on the actual distribution of newspapers, magazines, and other publications. Widely accepted throughout the industry, it certifies thousands of printed publications as well as emerging digital editions read via tablet subscriptions. Its publication audits are conducted in accordance with rules established by its Board of Directors. These rules govern not only how audits are conducted, but also how publishers report their circulation figures. AAM's Board of Directors is comprised of representatives from the publishing and advertising communities.

[6] https://auditedmedia.com/about/who-we-are.

[7] *See generally* Peter B. Turk, *Effective Frequency Report: Its Use And Evaluation By Major Agency Media Department Executives*, 28 J. ADVERTISING RES. 56 (1988); Peggy J. Kreshel et al., *How Leading Advertising Agencies Perceive Effective Reach and Frequency*, 14 J. ADVERTISING 32 (1985).

[8] Textbook sources that have identified the need for reach and frequency for years include: Jack S. Sissors & Jim Surmanek, ADVERTISING MEDIA PLANNING, 57-72 (2d ed. 1982); Kent M. Lancaster & Helen E. Katz, STRATEGIC MEDIA PLANNING 120-156 (1989); Donald W. Jugenheimer & Peter B. Turk, ADVERTISING MEDIA 123-126 (1980); Jack Z. Sissors & Lincoln Bumba, ADVERTISING MEDIA PLANNING 93 122 (4th ed. 1993); Jim Surmanek, INTRODUCTION TO ADVERTISING MEDIA: RESEARCH, PLANNING, AND BUYING 106-187 (1993).

22. ***Demographics.*** In selecting media to target the class, the demographics of likely class members were analyzed. According to MRI-Simmons syndicated media research, 97% of Adults in the United States are online and 84% of all Adults use social media.[9] Additionally, parents of children ages 9-18 who live in Alabama, New York, or Florida[10] have the following demographics:

- 45% men;
- 55% women;
- 51% are aged 25-44;
- 35% are aged 45-54;
- 13% are aged 55+;
- 57% have a pet;
- 53% have a household income of $100K or less;
- 47% have a household income of $100K or more;
- 61% work full time;
- 66% are married;
- 35% have a college degree or higher;
- 61% own a home; and
- 27% identify as Spanish/Hispanic.

**NOTICE PROGRAM DETAIL**

23. On January 20, 2026, the Court entered the *Order* ("Class Certification Order"), which certified the following class: All persons within each State who purchased a new Graco belt-positioning booster seat class from 2015 through 2021, including the states of Alabama, Florida and New York.

24. For purposes of the Notice Program, it is my understanding from counsel for the parties that the covered products are Graco belt-positioning highback booster seats, including the TurboBooster Highback Booster and AFFIX Highback Booster Seat.

**NOTICE PROGRAM**

***Individual Notice***

25. It is my understanding from counsel that counsel for Plaintiffs and Graco are working to determine whether contact information for potential class members can be identified from information

[9] MRI-Simmons 2025 Survey of the American Consumer®.

[10] Booster seats are generally recommended for children ages 4–12, though in practice many children transition out of them before age 12, making the effective upper age range closer to age 10. Based on the dates of the class period and that the children for whom these booster seats were purchased for are now older, we are targeting parents of children ages 9-18. "Children" ages 19-20 are not measurable in syndicated research.

available to Graco. To the extent potential class members are identified through reasonable efforts and usable contact information is available, Epiq will provide individual notice to those individuals via email and/or mail. The Notice will provide a summary of the case and the class members' rights and options and will include a link to the case website, where the recipient may review the Long Form Notice, the Class Certification Order, and other relevant case information.

***Individual Notice – Email***

26. If class member data is available and provided, Epiq will send an Email Notice to all identified class members for whom a valid email address is available. The Email Notice will clearly and concisely summarize the case and the legal rights of class members and include an embedded link to the case website. By clicking the link, recipients will be able to access the Long Form Notice and additional information.

27. **Email Validation & Hygiene:** Prior to sending the Email Notices, email validation and hygiene tools will be used to standardize the email addresses, verify whether the email addresses are valid, and identify and remove email addresses that are a fraud/reputation threat – such as email addresses maintained by bots, spammers, and phishers. This is a necessary and critical process for the effectiveness of email campaigns today. Without being proactive and using these tools, Email Notices inadvertently sent to bad actor email addresses could jeopardize and damage the reputation of the entire email campaign; likely causing the campaign itself to be flagged and blocked as a source of spam, preventing or delaying Email Notices from being sent to valid email addresses of class members.

28. **Email Best Practices:** In addition, the following industry standard best practices will be followed. The Email Notice is drafted in such a way, including the subject line, sender, and body of the message to avoid SPAM filters and ensure readership to the fullest extent reasonably practicable. For instance, the Email Notice will use an embedded html text format. This format provides easy-to-read text combined with intentional use of some graphic elements, that in Epiq's experience increase engagement without increasing the likelihood that the message could be blocked. The Email Notices will be sent from an IP address or multiple IP addresses known to major email providers as being associated with a legitimate bulk email sender. A digital signature and unique message identifier will be transmitted with each Email Notice, allowing Email Service Providers and Email Monitoring Services to programmatically authenticate that the Email Notices are from authorized email servers.

29. **Bounced Email Notices:** If the receiving email server cannot deliver the message, a "bounce code" will be returned along with the unique message identifier. For Email Notices for which a bounce code is received indicating the message is undeliverable for reasons such as an inactive or disabled account, the recipient's mailbox is full, technical autoreplies, etc., at least two additional attempts will be made to deliver the Notice by email.

***Individual Notice – Direct Mail***

30. Epiq will send a Postcard Notice to all identified class members with an associated mailing address for whom a valid email address is not available and for whom the Email Notice is returned as undeliverable after several attempts. The Postcard Notice will be sent via United States Postal Service ("USPS") first class mail. The Postcard Notice will clearly and concisely summarize the case and the legal rights of the class members. In addition, the Postcard Notice will also direct class members to the case website where they can access the Long Form Notice and additional information.

31. Prior to mailing the Postcard Notices, all mailing addresses will be checked against the National Change of Address ("NCOA") database maintained by the USPS.[11] In addition, the addresses will be certified via the Coding Accuracy Support System ("CASS") to ensure the quality of the zip code, and verified through Delivery Point Validation ("DPV") to verify the accuracy of the addresses. This address updating process is standard for the industry and for the majority of promotional mailings that occur today.

32. The return address on the Postcard Notices will be a post office box that Epiq will maintain for this case. The USPS will automatically forward Postcard Notices with an available forwarding address order that has not expired ("Postal Forwards"). Postcard Notices returned as undeliverable will be re-mailed to any new address available through USPS information, for example, to the address provided by the USPS on returned pieces for which the automatic forwarding order has expired, or to better addresses that may be found using a third-party lookup service. This process is also commonly referred to as "skip-tracing." Upon successfully locating better addresses, Postcard Notices will be promptly re-mailed.

***<u>Media Plan</u>***

[11] The NCOA database contains records of all permanent change of address submissions received by the USPS for the last four years. The USPS makes this data available to mailing firms and lists submitted to it are automatically updated with any reported move based on a comparison with the person's name and known address.

***Internet Digital Notice Campaign***

33. Internet advertising has become a standard component in legal notice programs. The internet has proven to be an efficient and cost-effective method to target class members as part of providing notice of class certification for a class action case.

34. The Notice Program includes targeted digital advertising ("Digital Notices") on the *Google Display Network*, which represents thousands of digital properties across all major content categories. Digital Notices, in English and Spanish, will be targeted to selected target audiences and are designed to encourage participation by members of the class—by linking directly to the case website, allowing visitors easy access to relevant information and documents.

35. The Digital Notices will also be placed on the leading social media platforms in the United States, including *Instagram*, *Facebook*, and *Reddit*. The social media campaign will use an interest-based approach which focuses on the interests that users exhibit while on the social media platforms, capitalizing on the target audience's propensity to engage in social media.

36. *Facebook* is one of the leading social networking sites in the United States with 197 million users,[12] and is the leading social networking site for moms living with children with approximately 81% engaging on *Facebook* regularly.[13] *Instagram* has 181 million active users in the United States.[14]

37. *Reddit* is a widely used social forum website that contains more than one million communities known as subreddits. These communities cover specific topics making this an ideal platform to reach individuals with focused interests. *Reddit* has approximately 196.5 million[15] Weekly Active Unique users in the United States.[16]

38. The Digital Notices will be distributed to a variety of target audiences, including those relevant to individual's demonstrated interests and/or likes. All Digital Notices will appear on desktop,

---

[12] Statista Digital 2026: Global Overview Report. Statista, founded in 2007, is a leading provider of worldwide market and consumer data and is trusted by thousands of companies around the world for data. Statista.com consolidates statistical data on over 80,000 topics from more than 22,500 sources and makes it available in German, English, French and Spanish.
[13] Statista Digital 2025: Social media platforms regularly used by moms living with children in the U.S. in 2025.
[14] Statista Digital 2026: Global Overview Report.
[15] In the three months that ended March 31, 2026.
[16] Reddit, Inc., Quarterly Report (Form 10-Q) for the Period Ending March 31, 2026, at 23 (filed May 1, 2026).

mobile, and tablet devices. Digital Notices on *Google Display Network*, *Instagram*, *Facebook*, and *Reddit* will be geo-targeted in the states of Florida, New York, and Alabama. Digital Notices will also be targeted (remarketed) to people who click on a Digital Notice.

39. More details regarding the target audiences, specific ad sizes of the Digital Notices, and the number of planned impressions are included in the following table:

| *Network/Property* | *Audience* | *Language* | *Ad Sizes* | *Planned Impressions* |
|---|---|---|---|---|
| **Distribution: Florida** | | | | |
| *Google Display Network* | Parents with children 9-18 years old | English & Spanish | 728x90, 300x250, 300x600 & 970x250 | 6,000,000 |
| *Select Parent Websites* | Visitors to select parenting websites[17] | English & Spanish | 728x90, 300x250, 300x600 & 970x250 | 2,000,000 |
| *Facebook* | Parents with children 9-18 years old and interests in parenting, parenting tweens and/or parenting teens | English | Newsfeed & Right Hand Column | 1,510,000 |
| *Instagram* | Parents with children 9-18 years old and interests in parenting, parenting tweens and/or parenting teens | English | Instagram Feed Ads | 1,650,000 |
| *Reddit* | Subreddit targeting to: r/Parenting, r/TeenNation, r/Parenting Tweens and/or r/ParentsofTeens | English | Feed Ads | 965,000 |
| **Distribution: New York** | | | | |
| *Google Display Network* | Parents with children 9-18 years old | English & Spanish | 728x90, 300x250, 300x600 & 970x250 | 7,000,000 |
| *Select Parent Websites* | Visitors to select parenting websites | English & Spanish | 728x90, 300x250, 300x600 & 970x250 | 1,920,000 |
| *Facebook* | Parents with children 9-18 years old and interests in parenting, parenting tweens and/or parenting teens | English | Newsfeed & Right Hand Column | 2,400,000 |
| *Instagram* | Parents with children 9-18 years old and interests in parenting, parenting tweens and/or parenting teens | English | Instagram Feed Ads | 2,600,000 |

[17] Select websites may include: parents.com, familyeducation.com, fatherly.com, daddilife.com, naturemoms.com, raisingteenstoday.com, thesimpleparent.com, todaysparent.com, yourteenmag.com and/or parentingteensandtweens.com, among others.

| *Network/Property* | *Audience* | *Language* | *Ad Sizes* | *Planned Impressions* |
|---|---|---|---|---|
| *Reddit* | Subreddit targeting to: r/Parenting, r/TeenNation, r/Parenting Tweens and/or r/ParentsofTeens | English | Feed Ads | 1,155,000 |
| **Distribution: Alabama** | | | | |
| *Google Display Network* | Parents with children 9-18 years old | English & Spanish | 728x90, 300x250, 300x600 & 970x250 | 500,000 |
| *Select Parent Websites* | Visitors to select parenting websites | English & Spanish | 728x90, 300x250, 300x600 & 970x250 | 120,000 |
| *Facebook* | Parents with children 9-18 years old and interests in parenting, parenting tweens and/or parenting teens | English | Newsfeed & Right Hand Column | 100,000 |
| *Instagram* | Parents with children 9-18 years old and interests in parenting, parenting tweens and/or parenting teens | English | Instagram Feed Ads | 307,000 |
| *Reddit* | Subreddit targeting to: r/Parenting, r/TeenNation, r/Parenting Tweens and/or r/ParentsofTeens | English | Feed Ads | 215,000 |
| **TOTAL** | | | | **28,442,000** |

40. Combined, approximately 28.4 million targeted impressions will be generated by the Digital Notices, which will be geo-targeted in the states of Florida, New York, and Alabama. The Digital Notices will run for approximately six weeks.[18] The Digital Notice campaign will be monitored using third-party ad-verification technology to identify and reduce fraudulent, bot-generated, non-human, or otherwise invalid traffic and to help ensure that paid impressions are delivered to the intended audiences.v Any traffic blocked by the ad-verification technology will not be reported in the final impression delivery reports or the final reach calculations. Clicking on the Digital Notices will link the reader to the case website, where they can easily obtain detailed information about the case.

***Sponsored Search Listings***

[18] The third-party ad management platform, ClickCease will be used to audit the Digital Notice ad placements. This type of platform tracks all Digital Notice ad clicks to provide real-time ad monitoring, fraud traffic analysis, blocks clicks from fraudulent sources, and quarantines dangerous IP addresses. This helps reduce wasted, fraudulent, or otherwise invalid traffic (*e.g.*, ads being seen by 'bots' or non-humans, ads not being viewable, etc.).

41. To facilitate locating the case website, sponsored search listings will be acquired on the three most frequently visited internet search engines: *Google*, *Yahoo!*, and *Bing*. When search engine visitors search for selected keyword combinations related to the case, the sponsored search listing advertisement created for this case will be displayed. Generally, the sponsored search listing advertisement will appear at the top of the visitor's website page prior to the search results or in the upper right-hand column of the web-browser screen. The sponsored search listings will be displayed in the states of Alabama, Florida, and New York. All sponsored search listings will link directly to the case website.

***Informational Release***

42. To build additional reach and extend exposures, a party-neutral Informational Release will be issued nationwide over *PR Newswire* in English and Spanish. The *Newsline* in English is distributed to approximately 13,000 general media (print and broadcast) outlets, including local and national newspapers, magazines, national wire services, television and radio broadcast media across the United States as well as over 4,000 websites, online databases, internet networks, and social networking media, with additional distribution to approximately 325 contacts covering Parenting. The Hispanic *Newsline* reaches over 1,900 Hispanic US general media contacts as well as up to 4,840 additional industry-specific Hispanic media contacts. The Hispanic Informational Release also includes a guaranteed placement on 40+ Hispanic websites and/or new portals.

43. The Informational Release will include the case website address and the toll-free telephone number. Although there is no guarantee that any news stories will result, the Informational Release will serve a valuable role by providing additional notice exposures beyond that which will be provided by the paid media.

***Case Website***

44. A case website will be established with an easy-to-remember domain name. Class members will be able to obtain detailed information about the case and review key documents, including the Complaint, Long Form Notice, Class Certification Order, and other important court documents. In addition, the case website will include answers to frequently asked questions ("FAQs"), instructions for how class members may opt-out (request exclusion), and how to obtain other case-related information. The website address will be displayed prominently in all notice documents.

45. The case website will also include chatbot functionality to allow class members to easily obtain additional information by submitting questions and receiving approved responses based on the content in the Notices and FAQs.

***Toll-Free Telephone Number & Contact Information***

46. A toll-free telephone number will be established for the case. Class members will be able to call for additional information, listen to answers to FAQs, and request that a Long Form Notice be mailed to them. The toll-free telephone number will be prominently displayed in all notice documents. The automated telephone system will be available 24 hours per day, 7 days per week.

47. A postal mailing address and email address will be established, providing class members with the opportunity to request additional information or ask questions.

## PLAIN LANGUAGE NOTICE DESIGN

48. The proposed Notices are designed to be "noticed," reviewed, and—by presenting the information in plain language—understood by class members. The design of the Notices follows the principles embodied in the Federal Judicial Center's ("FJC") illustrative "model" notices posted at www.fjc.gov. Many courts, and the FJC itself, have approved notices that Epiq's noticing experts have written and designed in a similar fashion. The Notices contain substantial, albeit easy-to-read summaries of all key information about class members' rights and options. Consistent with our normal practice, all notice documents will undergo a final edit prior to actual mailing and publication for grammatical errors and accuracy.

## CONCLUSION

49. In class action notice planning, execution, and analysis, we are guided by due process considerations under the United States Constitution, by federal and local rules and statutes, and further by case law pertaining to notice. This framework directs that the notice program be optimized to reach the class and, in a class certification notice situation such as this, that the notice or notice program itself not limit knowledge of legal rights—nor the ability to exercise other options—to class members in any way. All of these requirements will be met in this case.

50. The Notice Program is designed to reach the greatest practicable number of class members. To the extent potential class members are identified through reasonable effort and usable contact

information is available, individual notice will be provided. The Notice Program, including any individual notice via email and/or mail, combined with the Media Plan, is expected to reach at least 70% of the class, with an average frequency of 2.0 times. The reach will be further enhanced by internet sponsored search listings, an informational release, and a case website, which are not included in the estimated reach calculation. In 2010, the FJC issued a *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, which is relied upon for federal cases. This Guide states that, "the lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70–95%."[19] Here, the Notice Program will readily achieve a reach within that standard.

51. The Notice Program follows the guidance for how to satisfy due process obligations that a notice expert gleans from the United States Supreme Court's seminal decisions, which are: a) to endeavor to actually inform the class, and b) to demonstrate that notice is reasonably calculated to do so: "[W]hen notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," *Mullane v. Central Hanover Trust*, 339 U.S. 306, 315 (1950).

52. The Notice Program as designed for this case will provide the best notice practicable under the circumstances, conform to all aspects of Federal Rules of Civil Procedure Rule 23 regarding notice, comport with the guidance for effective notice stated in the Manual for Complex Litigation, Fourth and applicable FJC materials, and satisfy the requirements of due process, including its "desire to actually inform" requirement.

53. The Notice Program schedule will afford enough time to provide full and proper notice to class members before the opt-out deadline.

54. At the conclusion of the Notice Program, I will provide a declaration verifying the effective implementation of the Notice Program.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August __, 2026.

---

[19] FED. JUDICIAL CTR, JUDGES' CLASS ACTION NOTICE AND CLAIMS PROCESS CHECKLIST AND PLAIN LANGUAGE GUIDE 3 (2010), available at https://www.fjc.gov/content/judges-class-action-notice-and-claims-process-checklist-and-plain-language-guide-0.

Cameron R. Azari, Esq.